UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:22CR475AGF |
| | ) | |
| TIMOTHY SCOTT CARRON, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION AND MEMORANDUM OPINION
OF UNITED STATES MAGISTRATE JUDGE**

All pretrial matters in this case were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C.§636(b). Currently pending before this Court are Defendant Timothy Scott Carron's Motion to Suppress Tangible Evidence (Doc. 19) and Motion to Suppress Statements (Doc. 20). Mr. Carron is charged with one count of receipt of child pornography. After receiving a cyber tip from Tumblr, on September 17, 2019, police conducted both a manual and Cellebrite computer-assisted search of Carron's cell phone and found suspected child pornography on it. Carron asserts the search of his phone violated the Fourth Amendment because it was conducted without a warrant and without valid consent. *See* Doc. 19. Carron also asserts investigators violated his Fifth Amendment rights by interrogating him without first giving *Miranda* warnings. *See* Doc. 20.

On January 11, 2023, the parties appeared before the undersigned for an evidentiary hearing. The United States presented testimony of one of the investigating officers, Master Sergeant Patrick Sublette, with the Missouri State Highway Patrol as well as video footage from the body camera worn by Sergeant Sublette (Govt. Exhs. 1A-1J), a copy of the audio recording

from Sergeant Sublette's device (Govt. Exh. 2), and a copy of a cyber tipline report ("Cybertip")
(Govt. Exh. 3). Carron did not offer any additional evidence but cross-examined Sergeant Sublette.

After the hearing, the undersigned found that a transcript would be helpful to the Court's
understanding and review of the evidence and ordered that a transcript be prepared. The
transcript was filed on January 24, 2023, and all pretrial matters are now ready for a ruling. After
carefully considering the evidence presented by the parties and the parties' written submissions,
the undersigned makes the following findings of fact and conclusions of law.

## I.   FACTUAL FINDINGS

As relevant to the issues raised in Carron's suppression motions, based upon the
testimonial, documentary, and electronic evidence admitted at the evidentiary hearing, I make
the following factual findings:

At the time of the evidentiary hearing, Patrick Sublette was a Master Sergeant and
investigator with the Missouri State Highway Patrol ("Sgt. Sublette"). He had been employed by
the Missouri State Highway Patrol for sixteen years and was supervisor of the Digital Forensic
Investigative Unit, which investigates internet crimes, cybercrimes, and internet crimes against
children. He started investigating internet crimes against children in 2011 and did so
continuously up until the time of the hearing. Sgt. Sublette was also a member of the Internet
Crimes Against Children Task Force, a national task force that is administered in the State of
Missouri by the St. Charles County Police Department. At the time of the hearing, Sgt. Sublette
had extensive experience and training related to internet crimes against children including
training related to searches and forensic examination of electronic devices such as cell phones.
Sgt. Sublette was a credible witness and testified consistently with other evidence of record.

On September 16, 2019, Sgt. Sublette received a Cybertip designated as a high priority from the National Center for Missing and Exploited Children ("NCMEC").[1] The Cybertip contained information reported by Tumblr, a blogging and social networking website. Based on the Cybertip, it appeared that different Tumblr users were communicating online about child exploitation, making sexual references to children, and sharing photographs of suspected child pornography. Tumblr flagged one user, identified in the Cybertip as "Voyboybackagain," as a user in Park Hills, Missouri. According to the Cybertip, Voyboybackagain was chatting about his 15-year-old stepdaughter with another Tumblr user in a sexual way.

Concerned that a minor could be at risk, Sgt. Sublette immediately began to investigate the identity of "Voyboybackagain." Working with another Sergeant from the Cape Girardeau area, Sergeant Weadon, Sgt. Sublette was able to quickly identify Carron as the likely Tumblr user identified online as "Voyboybackagain." The investigators were able to identify Carron's address and, based on other social media postings by Carron's wife, were able to determine that there was likely a minor female living in Carron's home. The investigators also concluded that the images of the minor female found on other social media websites matched the photographs posted in the Tumblr Cybertip. Based on his investigation Sgt. Sublette learned Carron was 44 years old.

 One day after receiving the Cybertip, on September 17, 2019, Sgt. Sublette and Sgt. Weadon drove to the area near Carron's home. They spoke with Carron's wife on the telephone and, upon learning that Carron would soon be getting off work, decided to wait near his home. Sgt. Sublette was wearing a body camera which video and audio recorded the entire interaction between the officers and Carron.

---

[1] The Cybertip was designated as a "Priority level 1" tip which Sergeant Sublette defined as a tip that is deemed "most urgent and needs the most immediate response." Doc. 34, at p. 19-20.

When Carron arrived, the investigators approached him on his driveway and told him they were with the "highway patrol". *See* Govt. Ex. 1A. Sgt. Sublette told Carron they were "working on some stuff in the neighborhood" and that one of the neighbors said they called Carron. *Id.* Sgt. Sublette then asked Carron if anyone had called him; asked for his cell phone number; and asked if he had any missed calls, which Carron denied. *Id.* Sgt. Sublette then asked Carron if he could show him his phone so he could see if there was "anything missed on there." *Id.* In response, Carron pulled his cell phone from his pants pocket, appeared to unlock it, and turned the screen toward Sgt. Sublette so that he could view it, but did not hand Sgt. Sublette the phone. *Id.* Carron then put the phone back into this pocket. *Id.*

At the evidentiary hearing, Sgt. Sublette admitted that his questions about the call from a neighbor was a ruse he used to trick Carron into taking out his cell phone. Sgt. Sublette explained that he suspected Carron used his cell phone to post on Tumblr. So, when he approached Carron, he wanted to confirm that Carron had the phone with him.

Once Sgt. Sublette confirmed Carron had his cell phone, he abruptly began asking Carron about his Tumblr account and the man from "New Orleans" Carron had been communicating with on Tumblr. Govt. Exh. 1A, at 15:11:10. Then Sgt. Sublette asked Carron to "show [him]" if the conversation with the man from New Orleans was still on the phone; to which Carron responded that he didn't have Tumblr anymore and, in response to questions from Sgt. Sublette, Carron stated he had deleted Tumblr. *See id.* at 15:11:10-15:11:24.

During this exchange about the Tumblr account, Carron appeared to be scrolling through his phone. While telling the officers he deleted the Tumblr account, he slightly tilted the screen of his phone toward Sgt. Sublette as if attempting to corroborate his statement. *See id.* at 15:11:24-15:11:29. Sgt. Sublette then asked Carron "can I see that?" and reached toward the

phone. Carron replied "yeah" and handed the phone to Sgt. Sublette. Remaining near Carron,

Sgt. Sublette then searched the phone's home screens to confirm that he did not see Tumblr on

the phone. Sgt. Sublette kept Carron's cell phone and, at some point thereafter, Carron gave Sgt.

Sublette the unlock code for his phone.

The officers asked Carron if he knew the ages of the girls in the pictures shared with him

from the man from New Orleans, identified him as "LA fetish," and described what the girls in

the pictures were wearing. Once again, Carron demurred. Sgt. Weadon then told Carron "We

know about the Tumblr account" and told him that they knew about the pictures being sent and

had seen the pictures. During the exchange with Sgt. Weadon, Carron conceded that his Tumblr

name was "Voyboy or something like that;" admitted that he told the New Orleans user that his

(Carron's) stepdaughter was fifteen even though she was older; and identified his stepdaughter in

a picture Sgt. Sublette showed him. *Id.*  at 15:13:00-15:13:53. The officers then told Carron that

they needed to "figure out what's going on here" and that in taking the conversation between

Carron and the other Tumblr user at face value "it looks very bad." *Id.* at 15:14:02. Carron stated

that he understood. *Id.*

As the officers continued to talk to Carron and ask him questions, Carron asked if he was

"going to jail over this" and asked if he was "under arrest." Govt. Exh. 1B, at 15:20:32. Sgt.

Sublette told Carron that they were "trying to figure all that out;" that Carron was not "under

arrest;" and that if Carron did not want to talk to them, he could tell them so. *Id.* at 15:20:33-

15:20:53. Sgt. Sublette stated they were just trying to figure out what was going on and were

there just to talk. Sgt. Sublette emphasized that they ***did not*** pull Carron out of work, and they

***did not*** get a warrant; instead, the officers came to talk to Carron "man to man." *Id.* at 15:20:53-

15:21:00.

After Carron continued to talk with the officers on his driveway for three or four minutes, Sgt. Sublette asked if they could look in the house to "confirm backgrounds" in the pictures. *See* Govt. Ex. 1C, at 15:23:59. Carron agreed and, once the officers asked a few questions related to their safety, Carron and both officers entered Carron's house.

Once in the house, Carron was unrestrained and appeared to remain near the officers. Sgt. Sublette asked Carron if he had any inappropriate photos of his stepdaughter on the phone and asked about any other "apps;" to which Carron replied he did not. *See* Govt. Exh. 1D, at 15:28:40-15:28:44. Holding Carron's cell phone, Sgt. Sublette then asked, "can I look through here and take a look at all that?" to which Carron responded "sure". *See id.* at 15:28:43.

About fifteen minutes after entering Carron's house, Sgt. Sublette asked Carron if he would go with the officers to the local patrol station. He told Carron that he wanted to "double check [Carron's] phone to make sure that there's nothing still on here." *See* Govt. Ex. 1E, at 15:38:57-15:39:13. He explained that his laptop was at the office, suggesting that he needed it to further the investigation. *Id.* at 15:39:14-15:39:31. He also mentioned the possibility of Carron taking a polygraph at the station. Carron agreed to go with the officers to the station.

In the car on the way to the patrol station, Carron sat in the front passenger seat and was unrestrained. As they arrived at the station, Sgt. Sublette asked "on your phone, uh I just want - - can I hook- -can I go through your phone and double check, make sure there's nothing on there?" to which Carron agreed. Govt. Exh. 1F, at 15:39:18-15:49:40. At the evidentiary hearing, Sgt. Sublette explained that, during this exchange, he had started to ask Carron if he could "hook up" Carron's telephone so that its contents could be downloaded. However, he caught himself because he realized he did not know if the phone was a "supported device" that would allow for

downloads and wanted to avoid getting into a technical discussion with Carron before he knew if a download was even an option. *See* Evid. Hrng. Tr., Doc. 34, at p. 56-67.

Once at the patrol station, the officers placed Carron in a conference room with windows. Carron was offered water and remained, unrestrained, in the conference room for approximately 45 minutes. During that time, Sgt. Weadon spoke briefly with Carron and determined that Carron had a prior conviction. Sgt. Weadon also questioned Carron briefly about pictures and information in the Cybertip. Sgt. Sublette went to an adjacent room where he manually looked through Carron's phone and hooked the phone up to a laptop. After determining that the device could be downloaded with Cellebrite, Sgt. Sublette downloaded most, if not all, of the contents of Carron's cell phone. Sgt. Sublette's examination of the cell phone led to the discovery of videos and photographs that appeared to be child pornography.

Sgt. Sublette returned to the conference room and began to question Carron about a Telegram app and other things found on the phone, some of which Carron had deleted from his phone. *See* Govt. Exh. 1H, at 16:45:35-16:47:40. In response, Carron indicated that he believed he'd be going to jail, and Sgt. Sublette acknowledged that was very likely. Two armed officers entered the conference room and, after being allowed to make a call to this wife, Carron was subsequently taken into custody. *See* Govt. Exhs. 1I and 1J.

The entire interaction between Carron and Sgts. Weadon and Sublette appears to have been cordial, calm, and conversational. The officers went to Carron's home in an unmarked police car and both officers were dressed in plain clothes. At no point did either officer draw a weapon, make an overt show of authority, physically touch, or threaten Carron. Although at times Carron seemed a bit tentative, he was cooperative and appeared to be relatively at ease

throughout the encounter. Carron did not appear to be impaired or under the influence of any drugs or alcohol.

At no point after Sgt. Sublette took Carron's cell phone did Carron ask the officers to return his cell phone. Nor is there evidence that Carron asked Sgt. Sublette what he intended to do with the phone once they arrived at the station. During the 45 minutes he sat in the conference room, Carron did not ask Sgt. Weadon what was taking so long or ask what Sgt. Sublette was doing with his phone.

## II.    MOTION TO SUPPRESS EVIDENCE (DOC. 19)

Carron argues evidence seized from the search of his phone was the fruit of an unconstitutional warrantless search and should, therefore, be suppressed. In response, the United States argues there was no Fourth Amendment violation because the evidence at issue was the result of a consensual search by police. The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. However, "[t]he Fourth Amendment generally permits investigators to conduct a warrantless search [. . .] if they obtain […] voluntary consent." *United States v. Steinmetz,* 900 F.3d 595, 598 (8th Cir, 2018) (citing *Fernandez v. California*, 571 U.S. 292, 298-301 (2014)).

"Consent to search is voluntary if it is the product of an essentially free and unconstrained choice by its maker ... rather than the product of duress or coercion, express or implied." *United States v. Siwek,* 453 F.3d 1079, 1084 (8th Cir. 2006) (quoting *United States v. Mancias,* 350 F.3d 800, 804 (8th Cir. 2003)). "Voluntariness is a factual question determined by the totality of the circumstances." *Id.* In assessing whether consent was voluntary under the totality of the circumstances, courts consider factors like "a defendant's age, intelligence, and education; whether he cooperates with police; his knowledge of his right to refuse consent; and his

familiarity with arrests and the legal system." *United States v. LeBeau,* 867 F.3d 960, 971 (8th Cir. 2017). The United States "bears the burden of proving voluntary consent to a search by a preponderance of the evidence." *Id.* at 970 (quoting *United States v. Willie,* 462 F.3d 892, 896 (8th Cir. 2006)).

**A**.      ***Carron's Consent Was Voluntary***

Carron contends any consent to search his phone was involuntary or invalid because it resulted from deception and trickery by the officers. Courts have held that consent derived from deception and trickery can, under certain circumstances, render the consent invalid or involuntary. *See, e.g., United States v. Escobar,* 389 F.3d 781, 786 (8th Cir. 2004) (consent to search defendant's luggage was not voluntary because officer falsely told defendant that drug-sniffing dog positively alerted to the presence of drugs in the defendant's luggage); *United States v. Harrison*, 639 F.3d 1273, 1280-81 (10th Cir. 2011) (consent to search defendant's apartment invalid because ATF agents falsely told defendant they got an anonymous call that there were drugs and bombs at the apartment and asked to look around to see if there was any threat or danger to the community). However, the circumstances surrounding Carron's consent in this case stand in stark contrast to circumstances that have led courts in other cases to hold that deception and trickery by law enforcement rendered a defendant's consent involuntary.

Sgt. Sublette admitted at the evidentiary hearing that he engaged in a ruse to confirm that Carron had his cell phone on him. Specifically, Sgt. Sublette told Carron they were "working on some stuff in the neighborhood" and that one of the neighbors said they called Carron. Sgt. Sublette then asked Carron if anyone had called him. When Carron denied receiving a phone call, Sgt. Sublette asked Carron if he could show him his phone so he could see if there was "anything missed on there." Carron complied with the request by pulling out his cell phone and

tilting its screen toward Sgt. Sublette. However, Carron did not physically hand the phone over to Sgt. Sublette. Indeed, Sgt. Sublette did not ask to physically search Carron's phone, and Carron did not consent to a search of his phone, until *after* the officers started to question Carron about his Tumblr account. In sum, the evidence of record does not support Carron's contention that he consented to a search of his phone because of Sgt. Sublette's deceptive tactic.

Even when Sgt. Sublette's initial deception is considered, the totality of the circumstances amount to voluntary consent by Carron. At the time of the encounter, Carron was a 44-year-old man who appeared to be reasonably intelligent with prior experience in the criminal justice system. He met the two officers on the driveway of his home as he returned home from work in the afternoon. The officers identified themselves as law enforcement but were dressed in plain clothes and did not display badges, have weapons drawn, or otherwise make a show of authority.

The tone of the entire encounter between Carron and the officers was cordial, calm, and conversational. Although at times Carron seemed a bit tentative, he was cooperative and appeared to be relatively at ease throughout the encounter. Carron did not appear to be impaired or under the influence of any drugs or alcohol. At no point did either officer draw a weapon, make an overt show of authority, physically touch, or threaten Carron. When Carron asked the officers if he was under arrest, they told him he was not under arrest and he did not have to continue talking to them.

The officers made clear early in the interaction that they were investigating Carron's activity on Tumblr and that the activity involved minor females including Carron's stepdaughter. While questioning Carron on his driveway about his Tumblr account, the officers asked Carron to see his cell phone. Carron complied and handed his phone to Sgt. Sublette. Sgt. Sublette asked

Carron for the unlock code for his phone. Carron complied. The officers asked Carron if they

could look in his house to see if the physical features of his house matched the backgrounds in

the suspected child pornography from the Tumblr CyberTip. Carron complied and let the officers

into his home. The officers asked Carron if he would accompany them to the patrol station to see

about taking a polygraph test and so Sgt. Sublette could access his laptop and confirm that there

was nothing on Carron's cell phone. Carron agreed and went with the officers to the station.

During the drive to the patrol station, Carron sat, unrestrained, in the front passenger seat.

He chatted with the officers on the way to the patrol station. Once they arrived at the station, Sgt.

Sublette again asked Carron if he could "double check" Carron's cell phone to make sure there

was nothing on it. Carron agreed.

Once inside the station, Carron was not placed in the station's interview/interrogation room.

Instead, he was placed in a relatively spacious conference room with windows. He was

unrestrained and offered water. He waited for 45 minutes in the room while Sgt. Sublette

conducted a manual and computer-assisted search of Carron's phone in an adjacent room.

Based on the evidence presented, Carron appeared to have a remarkable lack of curiosity

about what Sgt. Sublette was doing with his cell phone for 45 minutes. He asked no questions

although his interactions with Sgt. Weadon gave him ample opportunity to do so. At no point

after Sgt. Sublette took Carron's cell phone did Carron ask the officers to return his cell phone.

Nor did Carron revoke his consent for officers to look at his phone to see if there was any child

pornography on it.

In sum, based on the totality of the circumstances, Carron's consent to the search of his

cell phone was voluntary.

### B.      *The Search Did Not Exceed the Scope of Consent*

Carron argues in the alternative that even if his consent was voluntary, the officers

exceeded the scope of his consent by conducting a computer-assisted download and search of his

phone at the station. The "scope of a search is generally defined by its express object." *See*

*Florida v. Jimeno,* 500 U.S. 248, 252 (1991). *See also United States v. Berger*, 823 F.3d 1174,

10 1177 (8th Cir. 2016) (holding that "[t]he scope of consent to search is measured by a standard

of objective reasonableness"). To determine the scope of consent, courts examine "the totality of

the circumstances including the interaction between the parties, the purpose of the search, and

the circumstantial evidence surrounding the search." *United States v. Beckmann*, 786 F.3d 672,

679 (8th Cir. 2015). "The scope of a suspect's consent depends on what the typical reasonable

person would have understood by the exchange between the officer and the suspect." *Steinmetz,*

900 F.3d at 600 (quoting *Florida v. Jimeno,* 500 U.S. 248, 252 (1991)). "Where a suspect

provides general consent to search, only an act clearly inconsistent with the search, an

unambiguous statement, or a combination of both will limit the consent." *Id.* (quoting *United*

*States v. Beckmann,* 786 F.3d 672, 679 (8th Cir. 2015)). When a defendant voluntarily gives an

officer a general statement of consent to search for an item that can be easily hidden, the officer

may search any container or place in which the item may be hidden; and "the Fourth Amendment

provides no grounds for requiring a more explicit authorization" to open the container. *See*

*Jimeno,* 500 U.S. at 251 (finding no Fourth Amendment violation where police searched closed

container in suspect's car; "it was objectively reasonable for the police to conclude that the

general consent to search respondent's car included consent to search containers within that car

which might bear drugs"); *Siwek,* 453 F.3d at 1084-85 (where defendant gave general consent for

officer to search his truck for weapons and drugs, it was objectively reasonable for officer to probe a drain hole in the truck in search of those items).

In this case, the officers made clear at the beginning of their interaction with Carron that the object of their search was suspected child pornography in the form of photos and Tumblr conversation threads between Carron and other Tumblr users. Carron provided unqualified consent for detectives to look through his cell phone multiple times during his interaction with police. Near the beginning of their interaction, when Carron informed the officers that he had deleted Tumblr from his phone, Sgt. Sublette asked, referring to Defendant's phone, "Can I look at it there?" Gov't Ex. 1A at 15:11:32. Carron responded yes and handed the phone to Sgt. Sublette.

After going into Carron's house and after asking about photos and applications that may have been on his phone at one point Sgt. Sublette asked, "Can I look through here and take a look at all of that?" Gov't Ex. 1D at 15:28:22. When asking if Carron would be willing to go to the patrol station, Sgt. Sublette told Carron: "I'd like to doublecheck your phone to make sure there is nothing still on here. And I've got my laptop up at the office, I just don't have it here with me." Gov't Ex. 1E at 15:39:09. Carron then agreed to accompany the detectives to the nearby Missouri Highway Patrol station. Finally, upon arriving at the station, Sgt. Sublette asked one more time, "Can I go through your phone and doublecheck to make sure there is nothing on there?" Carron once more responded yes. Gov't Ex. 1F, at 15:39:18-15:49:40.

In sum, Carron gave clear, general, and unequivocal consent to Sgt. Sublette to search his cell phone for evidence of child pornography, and it was objectively reasonable, under the totality of circumstances for Sgt. Sublette to believe Carron's consent extended to a computer-assisted search and download of the phone to search for child pornography.

Carron argues that because cell phones are inherently different—in both a quantitative and qualitative sense—from other types of objects and containers that might be in an arrestee's possession, it is not objectively reasonable for law enforcement to conclude that a general consent to search a cell phone encompasses consent to a Cellebrite or computer assisted forensic search of the phone. In support of his position Carron cites cases that are inapposite, including a dissenting opinion in *United States v. Gallegos-Espinal,* 970 F.3d 586, 593-95 (5th Cir. 2020).

Notwithstanding Carron's suggestions to the contrary, courts, including the Fifth Circuit, have held that general, unqualified consent to search a cell phone permits officers to conduct a forensic examination of the cell phone. For example, in *United States v. Thurman,* 889 F.3d 356 (7th Cir. 2018), agents arrested the defendant following a controlled drug transaction. Agents asked the defendant if they could search his phone and presented him with a consent to search form. *Thurman,* 889 F.3d at 368. The defendant refused to sign the form but "verbally agreed to the search," after which agents performed a forensic examination of the device. *Id*. The Seventh Circuit held that the defendant's "actions and the circumstances of the investigation adequately support[ed] a finding that he consented to the forensic examination." *Id.* In so holding, the Court found important that the defendant placed no limitations on his verbal consent and "did not restrict the agents' contemporaneous examination of his phone." *Id.* In addition, the Court held "Because it was clear that the agents were investigating Mr. Thurman's recent drug sales, a reasonable person in his position would expect them to search the phone for relevant deleted messages." *Id.* Finally, the *Thurman* Court found relevant that the defendant consented to search a cell phone, noting that a "reasonable person may be expected to know that recently deleted information can be reconstructed on a cell phone." *Id.*

The majority in *Gallegos* reached a similar conclusion.  *Gallegos*, 970 F.3d at 592-93.

Notwithstanding Carron's arguments to the contrary, what mattered to the court in *Gallegos* was

not the ***form*** of Gallegos' consent—written and verbal—but the breadth of it. In assessing the

breadth of Gallegos' consent, the court noted that Gallegos consented to a "complete" search of

his cell phone and authorized the seizure of any "materials" and "property" the agents may desire

to examine.  *Id.,* at 592. The majority concluded that "[a] typical reasonable owner of a cell

phone would know that a cell phone contains extensive personal information and would

understand that a 'complete' cell phone search refers not just to a physical examination of the

phone, but further contemplates an inspection of the phone's 'complete' contents." *Id.* As such,

the court in *Gallegos* held that the defendant's verbal and written consent to a "complete" search

of his search phone authorized the investigators' extraction and later review of data from the

defendant's cell phone and did not exceed the scope of the consent given. *Id.*

Here, the interaction between Carron and the officers makes clear that Carron provided

unqualified consent and did "not suggest any intent to limit the parameters of his consent."

*Thurman*, 889 F.3d at 368; *cf. United States v. Lopez Mendoza*, 601 F.3d 861, 868 (8th Cir. 2010)

(citing cases in which consent to "look" in a vehicle made objectively reasonable a search of the

entirety of the vehicle). In addition, as discussed above, the evidence of record demonstrates that

by the time Sgt. Sublette conducted the computer-assisted forensic search of Carron's phone,

Carron was well aware or should have been well aware of the purpose of the search of his phone.

That the officers were interested in doing more than swiping through the easily visible

parts of Carron's phone was also apparent. Sgt. Sublette asked Carron to accompany them to the

patrol station and linked that request to his desire to access his laptop and to look through

Carron's phone to make sure there was nothing—namely, child pornography—on there. At the

time Sgt. Sublette asked Carron to accompany them to the patrol station, the officers had already

spent a significant amount of time questioning Carron and physically looking at his cell phone.

Once at the station, Sgt. Sublette took Carron's phone into another room and did not reappear for

approximately forty-five minutes. Yet, there is no evidence that Carron asked what Sgt. Sublette

was doing with his cell phone during that time. This lack of curiosity on the part of Carron is

telling.

For the reasons stated above, based on the totality of circumstances, a reasonable person

in Carron's position would expect a search of his phone to include a search for hidden or deleted

photos, videos, or messages, as would require a forensic examination.

### III.    MOTION TO SUPPRESS STATEMENTS (DOC. 20)

Carron contends the officers violated his Fifth Amendment rights by interrogating him

without first giving *Miranda* warnings and moves to suppress incriminating statements he made

during the encounter with the officers. *See* Doc. 20, at p. 1-4. The United States argues Carron

was not entitled to *Miranda* warnings because he was not in custody during the questioning at

issue. *See* Doc. 26, at p. 16-19.

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to

be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 448-

450, 455 (1966), the Supreme Court recognized that custodial interrogations have the potential to

undermine the privilege conferred by the Fifth Amendment against self-incrimination by

possibly exposing a suspect to physical or psychological coercion. To guard against such

coercion, the Court established a prophylactic procedural mechanism that requires a suspect to

receive a warning before any custodial interrogation begins. *Id.* at 444. Unless suspects are

warned of their Fifth Amendment rights, any pretrial statements elicited from them are inadmissible at trial. *Id.* at 492.

The protections set forth by the United States Supreme Court in *Miranda* are triggered only when a defendant is both in custody and being interrogated. *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995). A defendant is in custody for purposes of *Miranda* when there is a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Giboney,* 863 F.3d 1022, 1027 (8th Cir. 2017) *(quoting United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). The Eighth Circuit has made clear that the determination is not made from the interrogator's perspective. Rather, the relevant inquiry is "how a reasonable person in [the suspect's] position would have understood the situation." *Id.; United States v. Perrin*, 659 F.3d 718, 719 (8th Cir. 2011); *United States v. Muhlenbruch*, 634 F.3d 987, 995-96 (8th Cir. 2011).

In *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), the Eighth Circuit identified six factors that should inform the court's analysis in determining whether someone is in custody for the purposes of *Miranda*:

> (1) [W]hether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police- dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

If present, the first three *Griffin* factors tend to show that a defendant was not in custody. *Giboney,* 863 F.3d at 1027 (quoting *Griffin*, 922 F.2d at 1349). The remaining three factors, if

present, favor a finding that the defendant was in custody during the interrogation. *Id.* Although "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors," *Griffin*, 922 F.2d at 1349, no one factor is dispositive, *United States v. Willie*, 462 F.3d 892, 897 (8th Cir. 2006). The Eighth Circuit has cautioned that "[t]he debatable marginal presence of certain judicially-created factors that ostensibly tend to 'aggravate the existence of custody' cannot create the functional equivalent of formal arrest where the most important circumstances show its absence." *United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004).

In this case, the United States stipulated at the evidentiary hearing that Carron was in custody for Fifth Amendment purposes shortly before his formal arrest at the patrol station, but disputes that he was in custody before that. *See* Doc. 34, at p. 5-6. [2]  Carron, on the other hand, appears to argue *Miranda* protections were triggered from the time the officers initially encountered him on his driveway through the time they questioned him at the station about what they found on his cell phone.

### A.   CARRON WAS NOT IN CUSTODY WHILE BEING QUESTIONED ON HIS DRIVEWAY AND INSIDE HIS HOUSE.

The Eighth Circuit has repeatedly held that in general, "[w]hen a person is questioned 'on his own turf,' . . . the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" *Czichray*, 378 F.3d at 826 (quoting *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984), and *United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir. 1985)). Based on the factual findings, Carron was on "his own turf" when

---

[2] While it is not entirely clear, it does not appear that the United States intends to offer any statements Carron made after this point into evidence. As such, this Report and Recommendation does not address, and the undersigned has not considered, the admissibility of any statements Carron may have made to police after the point at which the United States concedes Carron was in custody.

he answered the officers' questions on his driveway and inside his house. This fact alone undercuts any argument that Carron was in custody.

In addition to the fact that Carron was on "his own turf" the *Griffin* factors support a finding that Carron was not in custody. The atmosphere was not police-dominated. Carron was approached on the driveway of his home by two officers in broad daylight. The officers were dressed in plain clothes and did not brandish badges or weapons during their interactions with Carron. Carron was never handcuffed or physically restrained and, except to ensure officer safety, the officers did not attempt to limit Carron's movement during the interaction on the driveway and inside the house. The overall tone of the interaction was cordial on the part of the officers and cooperative on Carron's part. Except for Sgt. Sublette's initial "ruse" to determine whether Carron's cell phone was physically present, the officers did not otherwise engage in any deceptive tactics or conduct that would have transformed Carron's home into the "type of coercive setting that normally accompanies a custodial interrogation." *Czichray*, 378 F.3d at 826. Finally, and significantly, the officers told Carron he was not under arrest, and he did not have to speak with them.

In sum, based on the totality of circumstances, Carron was not in custody while answering questions on his driveway or inside his home.

### B.   CARRON WAS NOT IN CUSTODY WHILE BEING QUESTIONED AT THE STATION

Based on the factual findings, before going to the station, the officers told Carron he was not under arrest and made clear he was not required to go with them. Carron agreed to go with the officers and remained unrestrained both on the drive to the station and after arriving at the station. At the station he was not placed in an interrogation or interview room but was placed, unrestrained, in a conference room with one or more windows. The Eighth Circuit has held that

defendants questioned under circumstances nearly identical to those in this case were not in custody for *Miranda* purposes.

For example, in *United States v. Muhlenbruch,* 634 F.3d 987, 996 (8th Cir. 2011), "the defendant accompanied officers to the police station in a patrol car for questioning, the officers told the defendant before questioning that he was not under arrest and that he was free to leave at any time, and the interview took place in a small, windowless room." In holding the defendant was not in custody the Eighth Circuit placed "significant emphasis on the fact that the defendant was told before his interview that he was not under arrest" and the interview was voluntary. *Id.* at 996-97.

The defendant in *United States v. LeBrun,* 363 F.3d 715 (8th Cir. 2004), was similarly questioned in a station house. In concluding that *LeBrun* was not in custody for purposes of *Miranda,* the Eighth Circuit emphasized that LeBrun was "never physically restrained," "never placed in handcuffs" and the agents told LeBrun before interviewing him that "he was free to leave." *Id.* at 722.

The United States has stipulated that Carron was in custody for *Miranda* purposes shortly before his formal arrest, and the evidence of record supports that position. Based on the factual findings, after Sgt. Sublette completed his Cellebrite download and review of the contents of Carron's phone, he confronted Carron with child pornography found on his cell phone. Sgt. Sublette told Carron it was likely he would be arrested or go to jail, and two armed officers entered the conference room. However, before that point, given the freedom of movement and cooperative and cordial nature of Carron's interactions with Sgts. Sublette and Weadon, a reasonable person in Carron's position would not have perceived that he was in custody or otherwise not free to leave.

For all the foregoing reasons, Carron's motion to suppress statements should be denied. Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Tangible Evidence (Doc. 19) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Statements (Doc. 20) be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be conducted before the **Honorable Audrey G. Fleissig**. Judge Fleissig will schedule the trial by separate order at a later date.

Dated: April 7, 2023.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE